# IN THE DISTRICT COURT OF GUAM
# TERRITORY OF GUAM

FRANK UKAU and SOFILAN SINUK,

                Plaintiffs,

v.

JENNIE WANG, et al.,

                Defendants.

Case No. 1:11-cv-00030

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR COMPENSATORY DAMAGES**

     This is primarily a personal injury lawsuit, raising the claims of negligence and loss of consortium. It is also a suit for unpaid overtime. The plaintiffs are Frank Ukau and Sofilan Sinuk. The remaining defendants are Jennie Wang and Entity Construction.[1]

     A bench trial was held. The Court, having taken under advisement the objections to evidence offered at trial, and having considered that evidence, oral and documentary, now issues both its rulings on those objections and its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.    EVIDENTIARY RULINGS

### A. Exhibit 1: Ukau and Sinuk's Marriage

     Defendants objected to the admission of Sinuk's marriage certificate (part of Exhibit 1). The Court overrules this objection and admits the marriage certificate into evidence. Defendants first argued that the exhibit was not timely produced. But Defendants never asked for it in discovery, so

---

[1] Plaintiffs and Defendant Chung Kuo Insurance Co., Ltd., entered into an Amended Stipulation for Dismissal that was granted by the court on April 21, 2014. (ECF Nos. 93, 97).

1

Plaintiffs had no obligation to produce it. They next argued that the exhibit was not authentic. This argument is a non-starter. Authenticity requires only that Ukau "produce evidence sufficient to support a finding that the item is what [he] claims it is." Fed. R. Evid. 901(a). Here, Ukau and Sinuk—witnesses with knowledge, Fed. R. Evid. 901(b)(1)—testified that it was their marriage certificate.

True, there are some recent writings on the certificate suggesting that maybe the marriage was only finalized after this lawsuit's filing. But that does not make the document unauthentic. Ukau offered the document as-is, to show exactly what it shows. Whatever its probative strength is for the factfinder. *United States v. Tank*, 200 F.3d 627, 631 (9th Cir. 2000); *United States v. Hock Chee Koo*, 770 F. Supp. 2d 1115, 1121 (D. Or. 2011).

In sum, the objection is overruled, and the marriage certificate is admitted into evidence.

### B. EXHIBIT 29: LIST OF ALL REAL PROPERTIES OWNED BY ENTITY

Ukau seeks the admission of Exhibit 29, which is a list of all the real properties that Entity transferred after Ukau's accident. (ECF No. 107 at 12.) He asserts it is relevant both to Ukau's lien rights under 22 GCA §§ 9118 and 3214 and to punitive damages. (*Id.*) Defendants objected to its admission.

This exhibit is not relevant to any issue in this proceeding, so the objection is sustained and Exhibit 29 is therefore excluded. Liens are incidental to this case. Ukau can receive a lien only if he first prevails on his claims here. *See* 22 GCA §§ 9118, 3214. There is no separate evidence needed to establish a lien; it is just automatically granted by prevailing on the underlying claims. *See id.*

Plaintiffs voiced their concern that Entity had fraudulently transferred this property in an effort to evade judgment and the lien. But that concern is of no relevance here, and it must instead be brought in a separate fraudulent conveyance action. *See Town House Dept. Stores, Inc. v. Ahn*, 2000 Guam 32 (2000).

Nor is the exhibit relevant to punitive damages. These damages are permissible only where the wrongful conduct is so reprehensible as to warrant "further sanctions to achieve punishment or deterrence." 20 GCA § 2120. The wrongful conduct in the complaint is the tortious injury and non-compliance with overtime laws. Thus, the punitive damages question revolves around that conduct—whether the tortious conduct and non-compliance needs to be deterred—and not whether Entity fraudulently transferred property. If Entity did indeed fraudulently transfer any property, that conduct would be deterred through punitive damages in a fraudulent conveyance action.

Ukau's citation to one case (ECF No. 107 at 12) does not change this conclusion. That case says only that financial records are relevant to punitive damages. *Alhambra v. Superior Court*, 110 Cal. App. 3d 513, 520 (Cal. Ct. App. 1980). Presumably—the court never says—this is because real punishment requires considering the defendant's net worth (a $10,000 fine punishes McDonald's little, but a McDonald's cashier a lot). But the financial records here do not show Defendants' present worth; they show their former assets. This says nothing of Defendants' present worth.

In sum, the objection is sustained, and Exhibit 29 is not admitted into evidence.

### C. EXHIBITS F & G: POST-ACCIDENT PAYMENTS

Plaintiffs objected to the admission of Exhibits F and G. These exhibits show payments made from Entity and Wang to Ukau. These exhibits are relevant to Defendants' offset defense. If the payments are loans to Ukau, Defendants are entitled to offset this value from any judgment entered. This "right to set-off is a common-law right, which belongs to every creditor . . . ." John J. Dvorske, 80 C.J.S. Set-off and Counterclaim § 3; *see also Gratiot v. United States*, 40 U.S. 336, 370 (1841). These exhibits are relevant and material to Defendants' offset defense (ECF No. 4 at 6), so they are admitted, and the objection is overruled.

Ukau also argues that even if these exhibits are relevant to an offset defense, that defense was waived because Defendants supposedly forgave the loans. But that is not true. Defendants *offered* to settle this matter by paying Ukau the sum he would be entitled to under workers' compensation, through both a cash payment and forgiving the loans. Ukau declined, so no loans were forgiven. *See* Fed. R. Civ. P. 68(b) ("An unaccepted offer is considered withdrawn . . . .").

There is another argument on these exhibits. Defendants contend that *all* post-accident payments were loans. The evidence offered belies the claim. Some payments were specifically denominated as loans (per the checks' memo lines), and the Court agrees on that score: These payments were loans. But other payments were not denominated as anything (other than as "FOR Food Expenses" or similar). At trial, Wang's testimony on these exhibits was brief. It comprised basically one statement relevant to this issue: "This one he don't need us to pay back." Whatever that one was—the Court was not made aware—it was no loan. Because, by definition, loans must be paid back. Given the testimony, this Court finds that only payments that are denominated as loans are loans; the remainder are gifts. Thus, the total outstanding loans amount to $2,484.37.[2]

In sum, the objection is overruled, and Exhibits F and G are admitted into evidence.

//

/

---

[2] The Court arrived at this figure by summing all the checks or other documents in Exhibit G that specifically denominated themselves as loans. It does not include the checks that merely reference Ukau's car loan in the memo line because those checks basically say only that they are "for that car loan," not that they are a "loan for paying off that car loan." The checks that the Court found to be loans to Ukau comprise the following: a $200 check for expenses dated August 5, 2011; a $200 check for expenses dated August 8, 2011; a $60 check for card payments dated August 10, 2011; a $200 check for family expenses dated August 15, 2011; a $120 check for car insurance dated August 15, 2011; a $200 check for family expenses dated August 16, 2011; a $60 check for credit card payments dated August 18, 2011; a $200 check for family expenses dated August 23, 2011; an $80 check for family expenses dated August 24, 2011; a $200 check for family expenses dated August 29, 2010; a $200 check for a Citi Bank payment dated September 2, 2011; a $200 check for family expenses dated September 6, 2011; a $200 check for family expenses dated September 9, 2011; a $200 check for family expenses dated September 16, 2011; and a $164.37 check for the power bill dated September 27, 2011.

4

### D. EXHIBIT L: MIP APPLICATIONS

Ukau objects to the admission of Exhibit L because it is irrelevant. This exhibit is Ukau and Sinuk's application for insurance from the medically indigent program ("MIP"). It incorrectly omits Ukau's income from Entity. This could cast doubt on Ukau and Sinuk's credibility: They lied to defraud the Department of Public Health and Social Services. Accordingly, it is relevant to assessing credibility, and the Court therefore overrules the objection and admits Exhibit L into evidence.

### E. EXHIBIT M: COMPUTATION OF LABOR SERVICES

Ukau objects to the admission of Exhibit M because it is irrelevant. This exhibit addresses two things: (1) how many hours Ukau worked and the amount he was paid (including overtime), and (2) what Ukau would be entitled to under workers' compensation. The Court agrees that the workers' compensation calculation is irrelevant. This is a tort suit, and that calculation plays no role. But there is still the issue of unpaid overtime, and this exhibit goes directly to that. Accordingly, the Court overrules the objection and admits Exhibit M into evidence.

## II. FINDINGS OF FACT

Plaintiff Frank Ukau is a 41 year old man. But at the time of the accident that is the main subject of this lawsuit, he was 37. His highest attained level of education is fifth grade. Ukau married Plaintiff Sofalin Sinuk in 2003 in Chuuk State, Federated States of Micronesia, and they have remained married ever since. (Ex. 1.) They have school-age children. Ukau is a construction laborer by trade. It is the only occupation he has ever known.

Defendants are Jennie Wang and Entity Construction. Wang was, for all relevant times to the decision, the president and principal shareholder of Entity. She made basically all decisions on running the company, including deciding whether to enter a contract or to buy assets. Entity is no longer in business, having closed in 2012.

Ukau was Entity's employee. Entity did not have workers' compensation insurance coverage for Ukau, but it did have such coverage for other employees.

## A. THE ACCIDENT

On July 5, 2011, Ukau was working for Entity at a construction site. Wang was also present. She was loading steel panels into the back of her Toyota Tacoma, intending to return them to Home Depot. Before she could finish loading the panels, she needed to move the truck to let a car pass by. Wang then entered the truck, leaving the tailgate down and the steel panels unsecured.

The truck was parked on the incline of a gravel road. As she began backing up her truck, she experienced difficulty; the truck began slipping in the gravel. She failed to correctly observe her surroundings, and she felt her truck hit an unidentified object, which turned out to be a cement wall or similar object. She panicked and slammed on the breaks. The unsecured steel panels then fell out of the truck and onto Ukau's left leg. Excruciating pain followed, and Ukau thought he would die.

Wang called 911, and Ukau was admitted to the hospital. The leg worsened with time, and doctors informed him that the leg may need to be amputated below the knee. (Ex. 2.) On July 14, 2011, Ukau's leg bled significantly, and doctors determined that his leg needed to be amputated above the knee. (*Id.*) They performed the amputation, and he was discharged on July 27, 2011. (*Id.*) Ukau's injury remained painful throughout his hospital stay.

The pain continued after his discharge from the hospital, and it continues today. He occasionally feels phantom pains. He will feel a pain or itch in his left foot, only to realize he has no left foot. He once rose from bed and stepped on his left leg, only to realize as he fell to the ground that he lacks that leg.

Ukau now has a prosthesis. It itches, so he wears it only outside the house; he leaves it off at home and instead uses crutches.

The prosthesis is no panacea. He cannot walk normally with it. His gait is unsteady; stairs are difficult; and a thud follows every rotation of his left leg, as he lacks his knee. He cannot walk long distances. Nor can he run. Wet floors pose hazards and have made him fall. Even picking up items off the ground is laborious. Equally important, Ukau can no longer work in the only field he knows: construction labor.

Ukau's personal life has suffered, and he feels sad. He used to play volleyball and soccer, sometimes with his kids, sometimes with his friends. He no longer can engage in these sports activities. He also is unable to buy and carry groceries and water to their third floor apartment. In addition, he is unable to provide snacks for his children like he used to. Ukau still tries his best, but he is just not the same as he was before the accident.

So too has his family's life suffered. His children, in addition to being unable to play sports with him, have been teased because their dad is missing a leg. His kids once asked him when his leg will grow back so that he can go back to work and provide them snacks. Sinuk, his wife, is heartbroken to see Ukau the way he now is, and it has been hard on her.

### B. MEDICAL EXPENSES

This injury has imposed substantial medical expenses on Ukau that are not covered by his insurance. He has one bill totaling $10,898.11 ($5 of which Ukau has paid), another totaling $54,042.82, another $16,772.63, another totaling $26,984.06, and yet another for $5. (Ex. 32.) Besides that one $5 payment, the entire sum (totaling $108,702.62) remains outstanding. (*Id.*)

### C. POST-ACCIDENT PAYMENTS

Entity and Wang made several payments to Ukau after his accident. Some of these payments were gifts, and others loans. The loan amount equals $2,484.37, and they remain outstanding. *See supra* Part I.C.

### D. UNPAID OVERTIME

Ukau worked every pay period from February 23, 2009, to July 5, 2011. (Ukau's Testimony; Ex. 14.) His hours were long: He worked every day of the week, Monday to Sunday, from 7 a.m. to 6 p.m. (Ukau's Testimony.) He did not take any vacation time, and his only days off were due to illness. (*Id.*)

Entity had no records of Ukau's working hours, any breaks taken, or his days off. This is because their record-taking and record-retention procedures were poor to non-existent. Records of hours worked were kept on an ad hoc basis, with Wang Fusheng (an Entity employee) handwriting Ukau's hours on whatever paper he had in front of him, which sometimes was an envelope. (Wang Fusheng's Testimony.) These records were not transferred to a more permanent ledger. (*Id.*) In 2011, Fusheng moved, and most records were either trashed or lost. (*Id.*) The only records produced in this case were attempted reconstructions years after the fact and two envelopes with numbers scrawled on them. (*See* Exs. 6–7, 14.)

The Court knows neither the number of sick days taken nor the time taken for lunch or other breaks. There is simply no evidence on either score, but both numbers almost certainly must exist. The Court therefore finds he was sick or otherwise absent four days throughout the year, and took one hour's break each day.[3] Ukau thus accrued 1,280 hours of overtime in 2009, 1,520 in 2010, and 770 in 2011. But he was not paid over half of those overtime hours. Instead, he was paid for only 220.5 overtime hours in 2009, 701.5 hours in 2010, and 363.5 hours in 2011. He is therefore owed $26,707.86 in unpaid overtime.[4]

---

[3] The Court acknowledges the weakness of this calculation: The only evidence it received on these points is that Ukau took an unknown number of days off when he was ill. The Court did the best with what it had.

[4] This is how the Court reached this number. It started with Exhibit 14, which detailed Ukau's hourly and overtime wage rates, along with the amount of overtime that he was already paid. It also started with the finding that Ukau worked 10 hours per day, every day of the week—so generally 70 hours every week—except for 4 days per year when he was absent. The Court then calculated how much overtime wages Ukau should have received. Here, the Court calculated the owed

8

**E. LOST INCOME**

Ukau's expert testified that the best calculation of his lost wages, discounted to present value, is $957, 216. (Hiles' Testimony; Exhibit 10.) But this calculation is built on so many assumptions it cannot stand—to wit: that Ukau will never earn *any* money ever again; that Sinuk will not work more (or start working; we do not know whether she was already working at the time of the accident) to compensate for the lost income; that Ukau is entitled to the fringe benefit of Social Security, even though all evidence was that his jobs paid him cash-in-hand and that his current employer never withheld any taxes, whether income or Social Security; that absent the injury, he would have been able to continue as a construction labor until his 60s.

This figure is just too high. Without evidence of entitlement to Social Security, the Court finds he is not entitled to it.[5] Therefore, the present value of lost wages drops to $797,390.22. It could drop even further—say if there was evidence that Sinuk will work more to increase the lost income. But no such evidence was put on. Accordingly, the Court finds lost wages of $797,390.22.[6]

---

overtime per week by multiplying the number of overtime hours for that week (30 in almost every week; 20 in a week where he was absent) by the overtime wage rate. (*See generally* Ukau's Testimony; Ex. 14.) The Court then subtracted from this number the amount of overtime wages already paid. The difference is the amount of overtime owed.

The following are the specific numbers the Court found for each year. In 2009, Ukau was entitled to $13,995.00 in overtime pay, but received only $2,459.63. He was therefore owed $11,535.37 in overtime pay for that year. In 2010, Ukau was entitled to $18,480.00 in overtime pay, but received only $8,509.88. He was therefore owed $9,970.12 in overtime pay for that year. In 2011, Ukau was entitled to $9,900.00 in overtime pay, but received only $4,697.63. He was therefore owed $5,202.37 in overtime pay for that year.

[5] Social Security benefits are not automatic. Rather, they must be earned by first contributing to the Social Security system through Social Security taxes. It is possible for a person to lack sufficient contributions such that they are not entitled to Social Security benefits. *See* Social Security Administration, Determining Insured Status (2005), http://www.socialsecurity.gov/OP_Home/handbook/handbook.02/handbook-0201.html ("The number of quarters you have covered credits determine if you have enough credits for insured status."); Social Security Administration, What Every Woman Should Know 18 (2013), http://www.ssa.gov/pubs/EN-05-10127.pdf ("If you have not worked or do not have *enough* Social Security credits and you are married, you may be eligible for Social Security benefits as a result of your spouse's work." (emphasis added)).

[6] This is how the Court reached this number. It began with table 4 of the expert report (Exhibit 10), which Ukau's expert testified was the most accurate calculation. It then subtracted the discounted fringe benefits figure from this calculation. So, for example, the table's fringe benefits in year 1 equaled $5,448, and the present value factor for that year was .9872.

9

### F. LIFE EXPECTANCY

Ukau has a life expectancy of 14,965 days from the date of the accident. (*See* ECF No. 107 at 14); *see also* Social Security Administration, Actuarial Life Table (2009), http://www.socialsecurity.gov/OACT/STATS/table4c6.html.

## III. CONCLUSIONS OF LAW

Having found the facts, the Court now makes legal conclusions. Many of these conclusions turn on unanswered questions of Guam law. For these questions, this Court "must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.*, 306 F.3d 806, 812 (9th Cir. 2002) (internal quotation marks omitted). All of this Court's conclusions are such reasonable determinations.

### A. EQUITABLE ESTOPPEL IS NOT A DEFENSE

Wang and Entity argue that Plaintiffs are estopped from bringing this tort claim. (ECF No. 62 at 8–9 (hereinafter "Defendants' Trial Brief").) The thrust of the argument is that Ukau requested to be paid under the table as an independent contractor, and Entity and Wang did him a favor by honoring this request. (*Id.* at 8–9.) Defendants contend that Ukau did so because it enabled him to defraud the Guam government, so he cannot now seek to take further advantage of his independent contractor status by suing in tort. (*Id.*)

This argument fails to overcome the high bar for asserting equitable estoppel defenses. Equitable estoppel precludes a person "from asserting a right which he would otherwise have had." *Mobil Oil Guam, Inc. v. Lee*, 2004 Guam 9, ¶ 24 (internal quotation mark omitted). It "is to be *used cautiously* . . . ." *Id.* (internal quotation mark omitted). The right to be estopped here would be Ukau's

---

The Court multiplied those two numbers together, and then subtracted the product from the $957,216 figure. It repeated that calculation for every year in the table, including for the past earnings section of the table.

10

right to pursue a tort claim by instead limiting him to damages capped at the workers' compensation equivalent.

Estoppel has four requisite elements:

(1) the party to be estopped must be apprised of the facts;

(2) he must intend that his conduct will be acted upon, or act in such a manner that the party asserting the estoppel could reasonably believe that he intended his conduct to be acted upon;

(3) the party asserting the estoppel must be ignorant of the true state of the facts; and

(4) he must rely upon the conduct to his injury.

*Id.*

It is hard to see how these elements are satisfied, particularly the third element. Wang and Entity knew that they did not have workers' compensation insurance for Ukau. At best (for their defense), they honored Ukau's request to be paid in cash and treated him as an independent contractor. But even if so, Entity and Wang still knew they did not purchase insurance for Ukau. They therefore knew of the risk that he could be injured and that they could be liable—and they accepted that risk. Perhaps they even benefitted from this choice in the form of lower taxes or insurance premiums. The first element here also appears questionable: Ukau did not know Wang would injure him; he was not apprised of those facts.

Wang and Entity cite one case to support their equitable estoppel defense. (Defendants' Trial Brief at 8–9). This court stated that estoppel should be employed liberally to prevent "inconsistency in positions" in workers' compensation contexts. *See Marley v. M. Bruenger & Co.*, 6 P.3d 421, 423–24 (Kan. App. 2000). But Defendants stretch this language too far beyond that case's facts. That case regarded a worker who double dipped: He previously claimed he was an independent contractor and recovered damages for his injuries under an insurance policy for independent contractors, and he then claimed he was an employee and entitled to workers' compensation for those very same injuries. *See*

*id.* at 422–24. Ukau has not double dipped; he has not received compensation for his injuries in workers' compensation but rather has elected to seek compensation solely in tort. Therefore, *Marley*'s reasoning does not apply here.

In short, workers' compensation exists to protect both the employee and employer: the former by providing a modest sum without hassle; the latter by granting immunity from tort suits. *See* Eston W. Orr, Jr., Note, The Bargain is no Longer Equal, 37 Ga. L. Rev. 325, 325 (2002). Where an employer elects to hire an employee and not obtain workers' compensation insurance for him, the employer knows the facts and accepts the risks of a tort suit. For these reasons, equitable estoppel is no defense here.

### B. CO-EMPLOYEE IMMUNITY

Wang correctly contends that she, as a co-employee, is immune from a tort suit under workers' compensation law. (Defendants' Trial Brief at 5). Under Guam law, there is no cause of action against a co-employee. *See* 22 GCA § 9135. But this argument is narrow: She is immune only as a co-employee. She remains liable as Entity's president, 22 GCA § 9140(a), which she concedes (Defendants' Trial Brief at 7).

Wang further claims that one statutory section, Section 9140, limits damages against her to only the workers' compensation equivalent. (*Id.*) This section limits an employer's liability to "any compensation or other benefit which may accrue under the said Title . . . ." 22 GCA § 9140(a). This amount, she concludes, must be the workers' compensation equivalent because "compensation" means workers' compensation and that is what accrues under Title 22. (Defendants' Trial Brief at 7.)

This argument misconstrues the statutory scheme. Another section of Title 22, Section 9106, gives an injured employee two compensation options where "an employer fails to secure payment of compensation . . . ." *See* 22 GCA § 9106; *see also id.* § 9103 (defining employer to "include[ ] any

12

body of persons, corporate or unincorporated[,] . . . . [and] [i]t includes . . . [a] person who is in fact the proprietor[ ] or operator of the business"). This employee may seek "compensation under this Title" or she may "maintain an action at law . . . for damages . . . ." *Id.* So this section makes the employer (Wang) liable either for the workers' compensation amount or for the actual damages amount. For this section (Section 9106) to have any meaning, Section 9140 cannot be read as limiting the employer's liability to solely workers' compensation. Otherwise, there is no point of suing in tort because, either way, the employee would be limited to the workers' compensation amount.

This pragmatic reasoning finds support in Section 9140 itself. That section holds the employer liable for "any compensation or other benefit which may accrue under [Title 22] . . . ." *See* 22 GCA § 9140(a). Because Title 22 explicitly allows for a tort claim, the tort damages here constitute "any . . . other benefit" that has accrued under Title 22.

In sum, Wang is liable in tort for all Ukau's damages, and it is not capped at the workers' compensation equivalent.

## C. NEGLIGENCE

Ukau must prove four elements to succeed on a negligence cause of action:

> (1) A duty, or obligation, recognized by law, requiring the person to conform to a certain standard of conduct, for the protection of others against unreasonable risks of harm; (2) A breach of that duty, or failure to conform to the required standard; (3) Proximate cause (a close and causal connection, also known as legal cause); and (4) Actual loss or damage resulting to the interests of another.

*Fenwick v. Watabe Guam, Inc.*, 2009 Guam 1, ¶ 12 (internal quotation marks omitted).

### 1. Duty & Breach

Every person has a duty to use the care of a reasonable person to avoid injuring another person. *See* 18 GCA § 90101; *Fenwick*, 2009 Guam 1 at ¶ 12, Dan B. Dobbs et al., The Law of Torts § 127

13

(2d ed.). Therefore, Wang had a duty to use reasonable care to avoid injuring Ukau. Reasonable care requires, at minimum, that a truck driver "secure its cargo in a way that would prevent it from falling off the truck . . . ." *See Gaber Co. v. Rawson*, 549 S.W.2d 19, 22 (Ct. Civ. App. Tx. 1977); *see also Poffenberger v. Spriggle*, No. CX-90-1562, 1990 WL 212009, *1 (Ct. App. Minn. Dec. 24, 1990) (unpublished) (not securing tailgate may be negligent).

Wang breached this duty. A reasonable person would have at least attempted to secure the steel plates or the tail gate. Wang made no such attempt. *See supra* Part II.A. A reasonable person would have also observed her surroundings while driving. Wang did not, as she drove into a cement wall. *See id.* Underscoring Wang's breach of her duty is the fact that there was no urgency to act. She was not in danger of being hit by another car and needing quick action; she only needed to move her truck so that another car could pass by. *See id.*

### 2. Proximate Cause

Proximate cause is, at minimum, a but-for cause. *Fenwick*, 2009 Guam 1 at ¶¶ 13–14. It is satisfied here. But for Wang's failing to secure the steel plates, those plates would not have fallen on Ukau's leg, and he would not have suffered any injuries. Similarly, but for her failure to reasonably observe her surroundings and avoid hitting a cement wall, the steel plates would not have fallen out and Ukau would not have suffered any injuries.

Guam law also applies the substantial factor test to determine proximate cause; it does so only where there are two independent causes for the injury. *See id.* at ¶¶ 15–17. Assuming there are two independent causes here, Wang's conduct is a substantial factor. The *only* reason he lost his leg, let alone a substantial reason, was because of Wang's negligence. It was due to her negligent driving and her failure to secure the steel plates.

/

14

### 3. Damages

Because the other three elements are met, Ukau is entitled to damages. This is to be a reasonable amount that will compensate him for his harm and make him whole. *See id.* at ¶ 13. Damages include non-economic harms like pain and suffering and economic harms like medical expenses. *See He v. Govt. of Guam*, 2009 Guam 20, ¶¶ 69–84. Though technically doing so in another context, one Guam statute enumerates the full scope of economic and non-economic losses:

> (a) Economic loss shall mean any pecuniary loss resulting from harm, including the loss of earnings or other benefits related to employment, medical expense loss, replacement services loss, loss due to death, burial costs, and loss of business or employment opportunities, to the extent recovery for such loss is allowed under applicable local law. .
> . . .
> (c) Noneconomic loss shall mean loss for physical and emotional pain, suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of enjoyment of life, loss of society and companionship; loss of consortium, other than loss of domestic service; hedonic damages; injury to reputation and all other nonpecuniary losses of any kind or nature.

7 GCA § 6102; *Rutledge v. United States*, Civil No. 06-00008, 2008 WL 3914965, *17 (D. Guam Aug. 21, 2008).

First, economic damages. The Court already found that Ukau has $797,390.22 in lost wages and $108,702.62 in medical expenses. *See supra* Parts II.B, II.E. So he is awarded the same as damages.

As for non-economic damages, awarding damages for physical impairment and loss of enjoyment of life are not duplicative. *See Scott v. United States*, 884 F.2d 1280 (9th Cir. 1989). Ukau has lost his leg. He suffers phantom pains. The immediate pain of the injury was no doubt tremendous. He can no longer help his family in the same way, and he can no longer play sports with his kids and friends. And even though he tries to remain upbeat, he cannot, and he has changed for the worse. But with time, some of these non-physical wounds should lessen. For instance, his kids will eventually

strike out on their own and will no longer need his physical help. And he certainly will not again feel the crushing pain and fears of death that he felt at the time of the accident.

The Court awards non-economic damages as follows. For past, present, and future pain and suffering, $2,244,750 ($150 per day); for his permanent physical impairment and disfigurement, $1,750,000; for past, present, and future inconvenience and for lost enjoyment of life, $1,496,500 ($100 per day).

### D. LOSS OF CONSORTIUM

Spouses of wrongfully injured persons have a derivative loss of consortium claim. *See Villanueva ex rel. United States v. Comm. Sanitation Sys., Inc.*, 2005 Guam 8, ¶ 32. To have this derivative claim, they must be married at the time of injury. *See Sprague v. Kaplan*, 572 A.2d 789, 789–91 (Pa. 1990); *Doe v. Cherwitz*, 518 N.W. 2d 362, 364–65 (Iowa 1994); *see also Feliciano v. Rosemar Silver Co.*, 514 N.E.2d 1095, 1096 (Mass. 1987); *Leonard v. John Crane, Inc.*, 206 Cal. App. 4th 1274, 1283 (Cal. App. 2012).

Because Sinuk and Ukau were married at the time of injury, Sinuk has a derivative claim for loss of consortium. The accident has changed Ukau for the worse, and dealing with that—how it has affected their relationship, their family, and their life—has been hard on her. (*See* Sinuk's Testimony.) It breaks her heart. (*See id.*) The Court therefore awards Sinuk $104,755 ($7 per day).

### E. UNPAID OVERTIME

Employers are liable in tort for all unpaid overtime compensation. *See* 22 GCA § 3117(2). This Court already found that Defendants neglected to pay Ukau overtime compensation that he was due. The Court therefore rules in favor of Ukau on his unpaid overtime claim and awards damages of $26,707.86. *See supra* Part II.D.

### F. PUNITIVE DAMAGES

A plaintiff may recover punitive damages "where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages . . . ." 20 GCA § 2120. These damages are "for the sake of example and by way of punishing the defendant." *Id.*

Ukau cannot recover punitive damages for his tortious injury. Defendants are not guilty of oppression, fraud, or malice. Wang's culpability was that of negligence, nothing more. Accordingly, the Court will not award punitive damages on the negligence claim.

Nor will the Court award punitive damages on the unpaid overtime claim. The governing statute for unpaid overtime claims declares that punitive damages are appropriate only "in case[s] of [a] willful violation . . . ." 22 GCA § 3117(2). Willfulness, though not defined by statute, typically means that the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 358 (4th Cir. 2011).

There was no evidence of a willful violation here. Rather, the Court's sense is that Wang just did not know any employment law, and she figured that whatever she and her employees bargained for was legally acceptable. She did not realize these errors until discussing it with legal counsel after Ukau's accident. Maybe some could conjecture that she acted negligently, but there was no real evidence that she acted recklessly.

Ukau's argument for punitive damages rings hollow. He bases it on another statute that purports to require treble damages for all wrongfully unpaid wages. *See* 22 GCA § 3219(a). But that statute cannot control here. That statute applies to all wage underpayments. *See id.* Contrastingly, the statute the Court finds controlling applies only to "unpaid minimum wages" and "unpaid overtime compensation" claims—which are the specific claims presented here. *See id.* § 3117(2). The principle of *lex specialis* demands "that a narrower, more specific provision of a statute takes precedence over

17

a more general provision of the same statute . . . ." *Camacho v. Estate of Gumataotao*, 2010 Guam 1, ¶ 19; *see also Ukau v. Wang*, 2013 WL 6037150, *3, *7 (D. Guam Nov. 12, 2013).

### G. OFFSET

Entity and Wang have asserted an offset defense. (*See* ECF No. 4 at 6.) Under this defense, a "creditor" can offset the value of plaintiffs' debt from the judgment entered. *See* John J. Dvorske, 80 C.J.S. Set-off and Counterclaim § 3; *see also Gratiot v. United States*, 40 U.S. 336, 370 (1841). To prevail on this defense, Defendants must be creditors. A creditor is someone who is "entitled to the payment of money." *See* 20 GCA § 5102.

Defendants are creditors on some of their payments to Ukau. They are entitled to payment on their outstanding loans (but not gifts) to Ukau, which amounts to $2,484.37. *See supra* Part II.C. Total Damages are therefore reduced by this sum.

### H. ATTORNEY'S FEES

Guam law provides reasonable attorney's fees and costs for maintaining an unpaid overtime claim. *See* 22 GCA § 3117(3). These are therefore awarded and will be determined at a later proceeding.

/
/
/
/
/
/
/

## IV. CONCLUSION

The Court finds Defendants Entity and Wang negligently caused Ukau's injury and failed to pay him the overtime he was due. The Court awards Ukau compensatory damages in the amount of **$6,424,050.70**. This figure comprises the following categories of compensatory damages:

- **$797,390.22** for lost wages;
- **$108,702.62** for medical expenses;
- **$2,244,750.00** for past, present, and future pain and suffering;
- **$1,750,000.00** for permanent physical impairment and disfigurement;
- **$1,496,500.00** for past, present, and future inconvenience and for lost enjoyment of life; and
- **$26,707.86** for unpaid overtime.

Because Defendants negligently caused Ukau's injury and because Ukau and Sinuk were married at the time of that injury, the Court finds in favor of Sinuk on her loss of consortium claim. The Court awards compensatory damages of **$104,755.00** for this loss.

The Court finds partially in favor of Defendants' offset defense. Ukau's total damages are therefore reduced by **$2,484.37**.

In accordance with the foregoing findings of fact and conclusions of law, judgment is ordered entered (1) in favor of Ukau on his negligence and unpaid overtime claims against Defendants Entity and Wang in the amount of **$6,421,566.33** and (2) in favor of Sinuk on her loss of consortium claim against Defendants Entity and Wang in the amount of **$104,755.00**.

SO ORDERED this 26th day of June, 2014.



/s/ Frances M. Tydingco-Gatewood
   Chief Judge
**Dated: Jun 26, 2014**